879 A.2d 1015

**Erick SOLBERG & Deborah Sossen**

v.

**MAJERLE MANAGEMENT.**

**No. 138, Sept. Term, 2004.**

Court of Appeals of Maryland.

July 18, 2005.

Reconsideration Denied Sept. 2, 2005.

Beth Mellen Harrison (Francis D. Murnaghan, Jr., Appellate Advocacy Fellow of the Public Justice Center, Baltimore), on brief, for petitioners.

Raymond B. Via, Jr. (Linowes and Blocher, LLP, Bethesda), on brief, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

This is a breach-of-lease action in which the District Court, and on appeal the Circuit Court for Montgomery County, ruled for the landlord. The action ultimately was grounded on what the landlord argued was, and the Circuit Court found to be, an unjustified refusal by the tenants to permit inspections of the leased premises. The tenants, who are disabled, contended that the landlord was required by both the Federal Fair Housing Act (42 U.S.C. § 3601 *et seq.*) and the lease to make reasonable accommodations in light of their disabilities and that her agent failed to do so. Although there was a clear procedural glitch at the Circuit Court level, the relevant issue before us is essentially a factual one—whether there is substantial evidence in the record to support the Circuit Court's conclusion that the landlord did, indeed, attempt to make reasonable accommodations and that the tenants' refusal to permit scheduled inspections by the landlord's agent constituted a breach of the lease. We shall affirm.

## BACKGROUND

In September, 1999, Deborah Sossen and Erick Solberg, petitioners here, entered into a 24–month lease for a single-family dwelling at 10017 Brookmoor Drive, in Silver Spring, Maryland. The lease was evidenced by a Dwelling House

Lease and a U.S. Department of Housing and Urban Development (HUD) Section 8 Lease Addendum. For our purposes, two provisions of the lease are particularly relevant. Section 13 required the tenants to allow the landlord or her agent to enter the premises for the purpose of inspection at any reasonable time.

Section 27, which by its terms prevailed over any conflicting provisions in the lease, recited that the landlord had received "official medical testimony regarding tenants' requirement for special adaptations to accommodate to their handicapping conditions" and understood that they were on the Department of Agriculture's pesticide sensitive list. Based on that documentation, the landlord agreed to allow "reasonable accommodations and modifications for Tenants' disabilities." In that regard, the landlord agreed to create "the least chemical impact/load to Tenants' health," and that "[p]ersons entering unit *for repairs* will adhere to disability guidelines as per medical advice and Tenant instructions unless for emergency repairs to prevent damage to property." (Emphasis added). Section 27 precluded the landlord from terminating the lease except for certain causes, including "[s]erious or repeated violations of the terms and conditions of the lease."

The landlord was an individual who lived in Colorado, and, until June, 2001, she relied on her sister to manage the property. It is not clear whether any inspections of the property took place pursuant to § 13 during that period of time. In June, 2001, the landlord entered into a property management agreement with Majerle Management, Inc., in which she appointed Majerle as her agent to manage the property. The agreement required Majerle to make inspections of the property as it felt necessary, "but approximately twice annually," and to "report matters concerning the condition of the Premises to said Owner." On June 22, 2001, Mr. Majerle informed the tenants in writing that his company had been employed as the landlord's agent. In that letter, he advised:

"I will personally manage your home and will conduct routine matters including periodic inspections. The first

inspection is scheduled for July 11 between 3:15 and 4:15 PM. These inspections are conducted semi-annually, during normal business hours and you must be present. If this date or time is not acceptable, you may call to reschedule. Otherwise, your failure to be home will be treated as a broken appointment subject to a $125.00 charge."

On July 10—the day before the scheduled inspection-Mr. Solberg left a voice-mail message with Majerle and sent a confirming fax message cancelling the inspection.[1] His excuse was that their neighbors had been applying weed control to their homes and, due to Ms. Sossen's extremely ill nature, he and Ms. Sossen had to leave the area. Solberg noted that the Montgomery County Housing Opportunities Commission (HOC) also needed to conduct an annual inspection for its own purposes and that the Commission had been asked to reschedule "for a much later date due to her condition and the need to keep the house closed up and keep from tra[c]king in pesticide residue and other incitents." Solberg acknowledged "your need to inspect for the first time to know what you are managing" and promised "to work diligently to provide this to you at the first available time."

The inspection was rescheduled and took place without incident in August, 2001. Majerle said that, although there were no major problems, he noticed open electrical boxes in the ceilings, a hole in the ceiling in an upstairs bedroom, a lot of clutter both inside and outside the house, and the "[e]xterior not being taken proper care of." The County HOC also inspected the house in August and found a number of problems that Majerle resolved. In December, 2001, Solberg sent to Majerle several documents pertaining to his and Ms. Sossen's disability, among which was a "To Whom It May Concern" letter from Ms. Sossen's physician, Dr. Grace Ziem. Dr. Ziem advised that Ms. Sossen had a "severe medical condition

---

1. Solberg testified in one of the various court proceedings that he had spoken with Majerle "[a] couple of weeks" before the scheduled July inspection and explained the protocols that would need to be followed to accommodate his and Ms. Sossen's disability.

involving seizures and other severe consequences of exposure to even trace levels of irritants, pollutants and petrochemicals." As a result, she said:

"It is medically necessary that no individual coming to her home have fabric softener residue on their clothing, be wearing clothing that has been recently drycleaned or any other commercial cleaning process, not having pumped gas prior to coming, not wearing recently polished shoes, not having used or come into close contact that day with household or commercial cleaning agents including but not limited to ammonia or Clorox, not having a recent permanent (within about one week) or other beauty salon treatments within about two days. The individual should not have any scented product of any type on hair, body, or clothing. The individual should be a nonsmoker (or if a smoker, should come before smoking a cigarette that day and after shampooing, bathing, and washing clothes in baking soda and special products which the patient can describe). It is medically recommended that the person come as their first work activity of the day, to avoid contamination and severe consequences, coming directly from home, if possible. It is important that the individual not be in the home when the patient is not present because contaminants linger in the home in sufficient concentration to cause medical complications when she returns to her home." [2]

On March 20, 2002, Majerle informed the tenants that he had scheduled an inspection for April 1, 2002, between 1:30 and 2:30 p.m. and asked that, if they were unable to be home at that time, to call his office to reschedule. On March 29, Solberg faxed a letter to Majerle, stating that he had been out of town from February 5 to March 25 and had just learned of the date for the inspection. The point of his letter was that it was necessary to reschedule because "[w]e need to find out

---

**2.** It appears that the tenants' disability did not extend to animals. There was evidence that they had a cat, together with a litter box. Solberg testified that he and Sossen have a car that they drive. He did not indicate who pumped the gas for the car.

exactly when the neighbors plan lawn treatment and with what chemical prior to setting an appointment." He said that he would let Majerle know as soon as possible. Neither Solberg nor Sossen ever followed up with a new date.

On June 14, 2002, Majerle sent the tenants a notice to vacate the premises by July 31, 2002, assigning as reasons (1) unsatisfactory exterior conditions—mulch spread on lawn, repeated instances of vehicle parked on lawn; (2) repeated cancellations of management inspections; and (3) frequent complaints from neighbors. With respect to neighbor complaints, the letter stated that the tenants had "no right to chase after their pesticide applicators or to tell them what they can an[d] cannot do within their own property lines. You have allegedly told them that they may apply chemicals, but that they must notify you first." Solberg claimed that, because his mail was "on hold" since April 30, he did not receive the letter until the end of July. Solberg said that he called Majerle upon seeing the letter and offered to allow an inspection within the next "two to three weeks." Majerle rejected the offer and said that he could not continue to do business that way.

When the tenants failed to vacate the premises, Majerle filed a tenant holding over action in the District Court. That action, we are informed, was dismissed by Majerle when it was discovered that he had failed to provide sufficient notice to HOC, as required by the HUD addendum to the lease. In November, 2002, the landlord, through counsel, advised the tenants that the lease had expired September 10, 2001, and directed that they vacate the property by December 31. A copy of that notice was sent to HOC.

When the tenants failed to vacate, another tenant holding over action was filed in District Court. That, too, proved unsuccessful. In a decision rendered March 5, 2003, the court interpreted the wording of the lease and the addendum as providing for a continuing tenancy, notwithstanding a stated term, unless and until it was terminated by the landlord, the tenant, or agreement between the two, and that the landlord

could terminate only for specified causes. The court concluded that, although Majerle had acted reasonably and was not required to wash his clothes in baking soda, none of the listed causes for termination had been sufficiently proved. Accordingly, it held that the lease had not terminated and the tenants were not, therefore, holding over. The problem, the court said, was with the terms of the lease, not the actions of Majerle.

On May 6, 2003, Majerle informed the tenants that an inspection would occur on May 22, between 3:00 and 4:00 p.m. On May 20, as he had done on each previous occasion, Solberg cancelled the inspection. He asserted that three neighbors had hired a lawn company to apply herbicides or pesticides to their lawns, that he and Ms. Sossen were ill, and that it was medically necessary to reschedule the inspection "for a later date when we are able." He added that, due to their disability, "a mandatory rescheduled [appointment] will not be possible," but advised that he and Ms. Sossen were looking to find another place to live. Faced with yet another rejection, the landlord, on May 23, sent another notice to vacate, by June 30, 2003. In addition to the denial of inspection, the notice also mentioned frequent complaints from neighbors about both the condition of the house and "incessant and outrageous disturbances you have caused in this community."

When, as before, the tenants ignored the notice to vacate, the landlord filed an action for both tenant holding over and breach of lease. At trial, held in November, 2003, the parties reached an agreement that apparently was read into the record, later reduced to writing and signed by Majerle, but never signed by the tenants. It called for Majerle to inspect the property before February 29, 2004 and allowed the tenants to remain in possession until May, 2005.[3] In conformance

---

3. Petitioners did not include in the record a transcript of what occurred at the November, 2003 hearing. Apparently an agreement was reached and read into the record, but that agreement was to be reduced to writing and signed by the parties. Counsel for the landlord prepared such an agreement, which Majerle signed, but the tenants refused to sign it. In subsequent affidavits, Solberg and Sossen asserted that the

with that agreement, Majerle, on December 1, 2003, notified the tenants that an inspection would occur on December 17, 2003, between 3:30 and 4:30 p.m. On December 3, 2003, HOC, after denying the tenants' request for postponement, conducted its inspection of the house. On December 11, an attorney for the tenants cancelled the December 17 inspection, claiming that Ms. Sossen was "apparently still recovering from the fragrances dragged into the residence by the [HOC] inspector."[4] The attorney said that Mr. Solberg would contact Majerle "to schedule the inspection for a date prior to the end of February."

Majerle acceded to the request, even beyond the February 28 date. In a letter dated March 4, 2004, Solberg advised that the doctor was requesting that the inspection be delayed until the end of March. He attached a letter from Dr. Ziem dated February 18, 2004, addressed to "Dear Neighbors," that described in general Ms. Sossen's allergy and her susceptibility to life-threatening complications from exposure to pesticides and herbicides. Perhaps because the letter was meant for neighbors and not Mr. Majerle, it did not repeat any of the other "Don'ts" included in her 2001 letter, but mentioned only

---

written stipulation "did not completely reflect the terms to which had been agreed in November 2003." The only disparity mentioned in the affidavits was that "[t]he draft Settlement Agreement Plaintiff's counsel presented to the court included a provision that Tenants must allow an inspection before 2/28/04, but did not provide that if such inspection did not take place that Plaintiff would be entitled to possession. In contrast to the provision that said if tenants do not vacate by 05/31/05, Plaintiff would be entitled to possession." It appears, in other words, that the tenants agreed to permit the inspection before the end of February but would not agree to any sanction if they failed to honor that obligation.

4. The HOC inspector later testified that her appointment was for 9:00 a.m., that she arrived five minutes early and was not permitted to enter. When she tried again just after 9:00, Ms. Sossen informed her that she could not enter until Sossen's lawyer appeared. Not until the lawyer arrived and "cleared" her was the inspector allowed to enter. She said that, in preparation for the inspection, she had to wash her clothes in baking soda, could not use deodorant or any perfumes, could not have her nails freshly painted, and could not put gas in her car. What fragrance she "dragged" into the house is not clear.

the problem of pesticides and herbicides. Solberg also forwarded a copy of the HOC inspection report. In a telephone conversation, Majerle apparently told Solberg, based on the court's comments at the March, 2003 hearing, that he did not intend to be bound by all of the fabric softener and other restrictions, but intended to wash his clothes as he usually did. No further inspection ever occurred.

On March 19, 2004, Majerle filed a motion in the 2003 District Court case seeking judgment of possession. The motion referred to the November hearing and to the agreement that the landlord would be permitted to inspect the property by February 28, 2004. It averred that, although the landlord's attorney signed the stipulation, it was never signed or returned by the tenants and that the tenants had twice refused to permit an inspection. The motion pointed out that the HOC Inspection Report sent by Solberg described several problems that required immediate attention—electrical hazards, mildew spots, cracked window pane, large hole in ceiling, mold in pantry—and urged that the tenants' refusal to permit an inspection for the purpose of making necessary repairs constituted a breach of the settlement agreement. The tenants filed an opposition to the motion, in which they acknowledged that the inspection anticipated by the November agreement did not occur but contended that that was due to Majerle's refusal to reasonably accommodate the tenants' disabilities. On April 14, 2004, the court granted the landlord's motion and entered a judgment of possession.

The tenants noted an appeal to the Circuit Court for Montgomery County and proceeded as if the appeal were *de novo*. They did not order a transcript of the District Court proceedings, and, until the landlord ordered a transcript of the March 2003 proceedings in preparation for trial in the Circuit Court, all that the District Court transmitted were the original papers. The Circuit Court treated the appeal as a *de novo* one, and, through counsel, the parties confirmed that when they appeared for trial on July 29, 2004. Two witnesses testified for the landlord and both sides introduced exhibits. The tenants did not appear on the first day of trial, although

their attorney participated. Solberg appeared and testified on the second day of trial, which took place on August 4, 2004.

After listening to all of the testimony and considering the various exhibits, the Court concluded that the problem had become a test of wills between Majerle and the tenants and that the landlord "has provided reasonable accommodations with an effort to allow for rescheduling but each time that has happened, a roadblock has been thrown up by the tenant." The Court acknowledged that the problem may not be of the tenants' "own doing," but stated "I don't see under the facts and circumstances here, the tenants ever allowing the landlord to come in ... [b]ecause it's either a winter pesticide or it's a spring pesticide or it's termite inspections...." The Court ultimately found that there was a violation of § 27 of the lease "in a failure to allow inspection even with the accommodations, which the Court believes were reasonable on behalf of the landlord." It declared:

"The simple answer or the simple proof in the pudding is, that there just never has been an inspection since 2001 by the landlord up to the present date. And the Court doesn't see any future for them ever allowing, even when they reached a settlement, it couldn't be accomplished. So, for the various reasons the Court finds a breach of the lease and grants possession of the property to the landlord."

A written order to that effect was filed August 13, 2004.[5] We granted *certiorari* to review that conclusion.

## DISCUSSION

### Jurisdiction of Circuit Court

■ Although neither Majerle nor the landlord filed a cross-petition for *certiorari*, Majerle argues in its brief that

---

5. The action was based on both tenant holding over and breach of lease. The tenants had moved to dismiss the tenant holding over claim, and, in September, 2004, in response to the tenants' motion to revise the judgment, the court dismissed the tenant holding over claim. Although the order is somewhat unclear, it appears that the judgment of possession remained in effect, based entirely on the breach of lease claim.

the Circuit Court lacked jurisdiction to hear the tenants' appeal *de novo*. Ordinarily, we would not address an issue not raised in a petition for *certiorari*, but a jurisdictional defect may be noticed on our own initiative. The simple answer to the argument is that there was no lack of jurisdiction in the Circuit Court, and, in the absence of the issue being raised in a petition for *certiorari*, or added by us on our own initiative, the matter is not properly before us.

 Maryland Code, § 12–403(b) of the Cts. & Jud. Proc. Article (CJP) provides that an "appeal from the District Court sitting in one of the counties shall be taken to the circuit court for the county in which judgment was entered." Under that provision, the Circuit Court for Montgomery County clearly had jurisdiction over the tenants' appeal from the judgment of the District Court sitting in that county. CJP § 12–401(f) provides that, in a civil case in which the amount in controversy exceeds $5,000, exclusive of interest, costs, and attorneys' fees, the appeal shall be heard on the record made in the District Court. *See also* Maryland Rule 7–102. This case, involving the right to possession of a home with a rental value of at least $1,500/month, certainly involved an amount in controversy in excess of $5,000. *See Cottman v. Princess Anne Villas*, 340 Md. 295, 666 A.2d 1233 (1995); *Purvis v. Forrest Street Apts.*, 286 Md. 398, 408 A.2d 388 (1979); *Carroll v. Housing Opportunities Comm'n*, 306 Md. 515, 510 A.2d 540 (1986). Accordingly, the case should have been heard on the record made in the District Court.

 In CJP § 12–401(f), the General Assembly was very careful to delineate which kinds of District Court appeals were to be tried *de novo* in the Circuit Court and which kinds were to be heard on the District Court record. Civil cases in which the amount in controversy exceeds $5,000, certain petitions for injunction allowed in the District Court, and "in any case in which the parties so agree" the appeal is to be heard on the record. All other appeals are to be tried *de novo*. This construct is illuminating: the Legislature has expressly allowed the parties, by agreement, to have a case otherwise

triable *de novo* heard on the record but has not permitted the converse. It follows that the parties may not, by agreement or waiver, permit a case that the law requires be heard on the record to be tried *de novo.* Accordingly, if the Circuit Court, with or without acquiescence of the parties, tries a case *de novo* that should have been heard on the record, the error may be raised in a petition for *certiorari* to this Court, and, should we grant a petition raising that issue, we would ordinarily not permit a defense of waiver or non-preservation to deter us from reversing.

■ It does not follow from that, however, that an error of this kind is jurisdictional in nature. In *Carey v. Chessie Computer,* 369 Md. 741, 756, 802 A.2d 1060, 1069 (2002) we pointed out that we view a court's "jurisdictional" reach in terms of whether the court has "the *power* to render a judgment over that class of cases within which a particular one falls" and that, "we have tended, whenever possible, to regard rulings made in violation of statutory restrictions on a court's authority or discretion as inappropriate *exercises* of jurisdiction, voidable on appeal, rather than as an inherently void excess of fundamental jurisdiction itself." The Circuit Court had jurisdiction to consider and decide the tenants' appeal.

The problem for Majerle here is not one of waiver or acquiescence in the Circuit Court, but rather his failure to file a cross-petition for *certiorari* raising the issue and our disinclination to excuse that lapse.

### *Legality of Judgment*

■ The tenants make three complaints about the judgment below. Their main attack is that both the law and the lease require the landlord to make reasonable accommodations in light of their disabilities and that Majerle failed to do so. Their requests—the laundry list of DOs and DON'Ts—they claim were reasonable and the inability of Majerle to conduct inspections was due entirely to his refusal to accommodate those requests. They also contend that the landlord's claim was barred by *res judicata*—that the District Court ruling in

March, 2003 constituted a judgment that the landlord was not entitled to terminate the lease and that judgment was preclusive, and that the Circuit Court abused its discretion in not granting a continuance so that Dr. Ziem could testify.

■ The short answer to the *res judicata* and abuse of discretion claims is that they were not properly presented in the tenants' petition for *certiorari* and are therefore not properly before us.[6] We find no merit in their reasonable accommodation argument.

Although Majerle gingerly suggests that there was never any documentation that the tenants are, in fact, disabled, the landlord, in the lease and the addendum, clearly acknowledged that they were disabled. Otherwise, much of § 27 of the lease would have no meaning. As noted, the landlord acknowledged there that she had received "official medical testimony regarding Tenants' requirement for special adaptations to accommodate to their handicapping conditions."

■ 42 U.S.C. § 3604(f)(2) makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of" the buyer or renter. *Id.* Section 3604(f)(3)(B) defines "discrimination" as including "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* The essence of that definition is a requirement that landlords make accommodations that are (1) reasonable, and (2) necessary to afford handicapped persons an equal opportunity to use and

---

6. The question presented in the *writ of certiorari* was "[w]hether the Circuit Court erred as a matter of law by rejecting the tenants' defense to the breach of lease claim, based on MMI's refusal to make requested accommodations to its inspection policies, where the evidence established that the requests were reasonable, necessary for the tenants, and consistent with accommodations routinely provided by MMI to other tenants?" In a footnote included in the argument section of the petition, tenants raised the separate *res judicata* issue; but that is not a proper way to present the question.

enjoy housing. *See Bryant Woods Inn, Inc. v. Howard County, Md.,* 124 F.3d 597, 603–04 (4th Cir.1997).

In defining reasonableness—what is a "reasonable accommodation"—the Federal courts have looked to principles applied under § 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) and the Americans With Disabilities Act (42 U.S.C. § 12101 *et seq.*), in particular as enunciated in *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), and *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002). *See Giebeler v. M & B Associates,* 343 F.3d 1143, 1148–50 (9th Cir.2003).

What has emerged is that "[t]he reasonable accommodation inquiry is highly fact-specific, requiring a case-by-case determination" and that, as in the Rehabilitation Act cases, "we must view the reasonable accommodations requirement 'in light of two countervailing legislative concerns: (1) effectuation of the statute's objectives of assisting the handicapped; and (2) the need to impose reasonable boundaries in accomplishing this purpose.' " *Hovsons, Inc. v. Township of Brick,* 89 F.3d 1096, 1104 (3rd Cir.1996) (quoting from *United States v. California Mobile Home Park Management Co.,* 29 F.3d 1413, 1418 (9th Cir.1994) and *Americans Disabled for Accessible Pub. Transp. (ADAPT) v. Skinner,* 881 F.2d 1184, 1191 (3rd Cir.1989) (*in banc* )).

In this analysis, the courts have made clear that, among other factors, they must look at the costs and burdens of any requested accommodation. In *Bryant Woods, supra,* the Court, quoting in part from both *Southeastern Community College v. Davis, supra,* and *Alexander v. Choate, supra,* noted that:

" 'Reasonable accommodations' do not require accommodations which impose 'undue financial and administrative burdens' [quoting *Davis* ] or 'changes, adjustments, or modifications to existing programs that would be substantial, or that

would constitute fundamental alterations in the nature of the program' [citing *Choate* ]."

*Bryant Woods, supra,* 124 F.3d at 604. *See also Tsombanidis v. West Haven Fire Dept.,* 352 F.3d 565 (2nd Cir.2003) ("A defendant must incur reasonable costs and take modest, affirmative steps to accommodate the handicapped as long as the accommodations do not pose an undue hardship or a substantial burden."); *Howard v. City of Beavercreek,* 276 F.3d 802, 806 (6th Cir.2002) (accommodation is reasonable "when it imposes no 'fundamental alteration in the nature of the program' or 'undue financial and administrative burdens' ") (quoting in part *Southeastern Community College v. Davis, supra,* 442 U.S. at 410, 99 S.Ct. at 2369–70, 60 L.Ed.2d at 990).

The tenants have never claimed that § 13 of the lease, requiring them to permit inspections by the landlord at reasonable times, is not a reasonable, neutral, enforceable requirement. Nor have they claimed that the procedure used by Majerle, of limiting the inspections to one hour during ordinary working hours, giving them 10 days or more advance written notice, and permitting them to reschedule an inspection if the initial time is not convenient, is not reasonable. What they have done is to condition the right to inspect not on bending some business practice or protocol but on Majerle making wholesale and dramatic changes in his own lifestyle and personal hygiene—not using ordinary detergents to wash his clothes, not wearing deodorant, or recently dry—cleaned clothes, or polished shoes, or polished nails, or scented fragrance of any kind, not putting gas in his car before coming to inspect, coming to their house directly from his own as his first work activity of the day. Apart from all of that, which at least in combination crosses the boundary of anything reasonable, they have further conditioned his inspections on what the neighbors not only were currently doing, but what on the day of the inspection a week or so in the future they *might* be doing in their own homes and yards, all of which was entirely beyond Majerle's control.

The combination of these barriers has effectively precluded any inspection of the home since August, 2001. We are aware

of no case that has mandated anything close to those kinds of conditions as a reasonable accommodation; certainly, none has been cited to us. It is truly unfortunate that Solberg and Sossen suffer from such an extensive allergic condition. We accept that they are handicapped and are entitled under both Federal law and the lease to a reasonable accommodation in the rules and practices relating to their dwelling. What they have insisted upon, however, is simply not reasonable.

**JUDGMENT OF CIRCUIT COURT FOR MONTGOM-ERY COUNTY AFFIRMED, WITH COSTS.**