

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-13-00220-CV
_____

DENNIS HEINERT AND ALL OTHER OCCUPANTS, APPELLANTS

V.

WICHITA FALLS HOUSING AUTHORITY, APPELLEE

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court No. 178,027-B, Honorable W. Bernard Fudge, Presiding

July 29, 2014

OPINION

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

Appellant, Dennis Heinert, appeals the trial court's judgment evicting him from his leased residence operated and managed by appellee, Wichita Falls Housing Authority (WFHA).  On appeal, he contends that there was insufficient evidence to support the trial court's findings and conclusions as to the conditions that would lead to the termination of Heinert's lease.  We will affirm.

Factual and Procedural History

The Parties to and Terms of the Lease

WFHA is a federally-supported independent Public Housing Agency (PHA) and provides housing to low-income individuals and families at reduced rental rates. Heinert has been adjudged disabled by the Social Security Administration and receives social-security disability income.[1] Heinert first began living in WFHA apartment 300C Lincoln in 2004 and remained in that apartment until he was evicted on April 13, 2013, when he was evicted in the underlying forcible detainer action leading to the instant appeal.

The most recent written lease agreement, automatically renewed annually by law, was dated August 4, 2009. By the terms of the lease, Heinert agreed to the following provisions, *inter alia*:

> 20. To act in a cooperative manner with neighbors, and Management staff. To refrain from and cause Resident's household members and guests to refrain from acting or speaking in an abusive or threatening manner toward neighbors and Management staff.
>
> 21. To act, and cause Resident's household members and guests to act in a manner that will not disturb other residents' peaceful enjoyment of their accommodations and that will be conducive to maintaining all Housing Authority developments in a decent, safe and sanitary condition.
>
> . . .
>
> 24. That the Resident, all members of the Resident's household, guests and all other persons under the Resident's control shall not engage in any drug-related or violent criminal activity and any other criminal activity on or off the property that threatens others, including but not limited to:

---

[1] *See Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 338 (E.D.N.Y. 2012) (remarking that, "in most cases, individuals who meet the definition of disability for purposes of receiving SSI or SSDI benefits also qualify as disabled under the federal disability statutes").

2

a. Engaging in any criminal activity, to include theft, physical and verbal assaults, that threatens the health, safety, or right to peaceful enjoyment of WFHA's premises by other Tenants, WFHA employees, agents of WFHA, or other persons. A criminal conviction is not needed to demonstrate serious violations of the lease.

<u>Heinert's Increasingly Erratic Behavior</u>

Sometime around the late summer of 2012, Heinert began to engage more frequently in bizarre and, at times, alarming interaction with fellow residents in the apartment complex. Already generally considered a "disruptive tenant," Heinert became the subject of more and more resident complaints to the staff at around this time.

One resident, who considered Heinert a friend and expressed her concern for his well-being, testified that Heinert repeatedly showed up at her apartment, both by invitation and without one. She was largely unbothered by the daytime drop-in visits but did not want him coming over after 9:00 p.m. She alerted Heinert of her wishes, but he continued to make unannounced nighttime visits and would, at times, try to open her locked door without her permission. She testified that Heinert would sometimes just sit on her porch and would often go over to another resident's apartment and rake leaves in the late night and wee morning hours despite that resident's wishes. Heinert would leave notes on another resident's vehicles asking the whereabouts of that one particular resident and would leave gifts for her though the gifts were always rejected.

Yet another resident testified that Heinert would come over uninvited to her house and rattle the doorknob to her locked door in an effort to gain entry. In fact, on one occasion, he did come into her home unannounced while she there. She was understandably startled when Heinert was present and attempted to make physical

3

contact with her in the form of what she anticipated would be a hug. She reported the incident to WFHA staff. She testified that she was intimidated by Heinert and tried to avoid him when she was out and about in the complex or sitting outside her apartment. Heinert repeatedly approached her and asked her to watch his apartment because he suspected that people had been stealing from him. She complained, too, that whenever Heinert approached her, he would try to hug her, which she felt was inappropriate.

Interaction with WFHA Staff

In response to the increasing number of complaints from fellow residents of Heinert's behavior, the WFHA staff contacted Heinert, discussed with him his behavior and fellow residents' concerns, and attempted to counsel him on refraining from the uninvited visits to his neighbors. WFHA also attempted to contact area mental health resources, such as Adult Protective Services and the Helen Farabee Center, to arrange for services and assistance for Heinert.

On October 25, 2012, Heinert left a voicemail on the phone of WFHA's Executive Director Donna Piper. Though portions of the voicemail are difficult to hear or understand, Heinert can be heard saying "something about him being killed and other people were going to be killed" and referring to "bullets through [certain WFHA] truck[s]." The voicemail is approximately two minutes and seventeen seconds long and concludes with Heinert saying, "Take care and God bless you." Piper reported the phone call to the police and filed a report.

In addition to its efforts to access mental health services for Heinert, WFHA staff also attempted to work with Heinert. Sometime after Heinert left the threatening

4

voicemail, the WFHA staff called for a meeting with Heinert's brother, Ray, in an attempt to avoid eviction proceedings. Apparently, nothing of note came from that meeting. Shortly after WFHA initiated eviction proceedings in mid-November, Heinert showed up at the office in what seems to be an attempt to persuade WFHA staff to reconsider and abandon its eviction efforts. That meeting did not go as Heinert had wished; he became very upset and announced that he owned the WFHA, that he was going to fire the staff, and that there would be "bullets for everyone" before he stormed out of the office.

In response to Heinert's outburst, Piper instituted additional safety measures to protect her staff and the residents because she had known Heinert to possess a firearm and also knew him to be violent in the past—Heinert's brother, Ray, with whom the WFHA had frequent discussions regarding Heinert's behavior, reported that Heinert hit him and caused the black eye obvious on Ray's face at a meeting with WFHA staff. Maintenance requests made by Heinert following the message and the outburst were still answered by the staff but only with a police escort. Piper insisted that she was in a position to take the threats seriously; it was not within her expertise to decide whether he really meant to do harm to the staff. She testified that she personally felt threatened.

Even after eviction efforts were underway, Alison Duncan, WFHA self-sufficiency coordinator, invited both Heinert and Ray to a meeting in late November. Heinert came very late to that scheduled meeting and, it seems, again declared himself the owner of WFHA and threatened to fire Duncan. Nothing in the record suggests that any progress was made at that meeting, an apparent last-ditch effort to avoid eviction. According to Piper, eviction is not a measure WFHA enters into lightly.

5

<u>Heinert's Mental Health and Disability</u>

Beginning in December 2012, Stefanie Teruel became Heinert's case manager at the Helen Farabee Center for mental health. She testified that, as part of her duties as his case manager, she meets with Heinert for at least three hours a month—more typically, she meets with him weekly—and works with him on social skills, medication compliance, and economic problem-solving skills. She explained that Heinert "does tend to ramble" and "can be hard to follow." She acknowledged, too, that he does have fairly evident mood swings and described Heinert as having a gap in his social skills that can lead him to become overly involved and fail to recognize that his attempts at closeness can become unwelcome by others.

Teruel testified that she does not believe that Heinert poses a threat to the WFHA staff. In fact, she denied any fear that Heinert would issue a threat against anyone and denied ever having seen him display any violent outburst. Teruel has never had to exercise her duty to report Heinert as a danger to himself or others. She did note that Heinert required more intensive treatment from the Helen Farabee Center beginning in December 2012 than he had required during previous visits to the center because he had begun to exhibit more paranoia, more racing thoughts, and more rambling. Even still, Teruel testified again, she did not consider Heinert to be a potential danger to anyone; she had been alone with Heinert on several occasions and never felt threatened at all by him. With respect to how Heinert's neighbors may respond to him, Teruel characterized Heinert as more of a "nuisance" than he is "intimidating." The fellow residents' accounts of their interaction with Heinert largely reflect this "nuisance" characterization, although one specifically testified that she found him "intimidating."

6

Evidence pertaining to Heinert's hostile interactions with the WFHA staff conflict with Teruel's characterization of Heinert.

Judicial Proceedings, Reasonable Accommodation Requests

WFHA obtained a judgment of eviction in the Justice of the Peace, Precinct 1, Place 1, of Wichita County, Texas, on November 30, 2012. On December 4, 2012, Heinert perfected his appeal by trial *de novo* to the 78th District Court of Wichita County. Prior to trial *de novo* in the district court, Heinert's attorney sent first and second requests to WFHA for a reasonable accommodation for Heinert's disability, dated February 13, 2013, and February 21, 2013, respectively.[2]

Following a trial on the merits held on March 3 and 20, the trial court signed a judgment of eviction on March 28, 2013, that required Heinert to vacate the premises and to pay counsel for WFHA $2,500.00 in attorney's fees. The trial court found that Heinert had breached his lease, that he had adversely affected the peaceful enjoyment of other tenants, that he had committed a criminal offense of terroristic threat, that WFHA did not and could not obtain a reasonable accommodation of Heinert's disabilities, and that WFHA was not required to make a reasonable accommodation under these circumstances at any rate. Heinert appeals the trial court's judgment of eviction, challenging by five points of error the sufficiency of the trial court's findings that he committed a terroristic threat and that he disturbed the peaceful enjoyment of other

---

[2] We note that these formal requests for accommodations came shortly before trial *de novo* in the district court and had not been sent to the WFHA staff at the time of the proceedings in the justice court. WFHA does not challenge the accommodation requests on the basis of their timeliness in relation to trial.

WFHA tenants.  By three additional points of error, Heinert also challenges the trial court's findings and conclusions as to WFHA's duty to reasonably accommodate him.

Applicable Law

Federal Law Governing Public Housing

As a federally-subsidized housing authority, WFHA is governed by the United States Housing Act of 1937 and its attendant regulations.  *See* 42 U.S.C.A. §§ 1437–1437z-8 (West 2012); *Geters v. Baytown Hous. Auth.*, 430 S.W.3d 578, 582 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also Carrera v. Yepez*, 6 S.W.3d 654, 657 n.5 (Tex. App.—El Paso 1999, pet. dism'd w.o.j.) (discussing purpose, creation, and governance of public housing authorities).  "The operation of public housing by [public housing authorities] is subject to comprehensive federal regulation.  Among other things, federal law dictates much of the content of public housing leases, requiring the inclusion of various provisions and prohibiting other provisions."  *Sager v. Hous. Comm'n of Anne Arundel Cnty.*, 855 F. Supp. 2d 524, 531 (D. Md. 2012) (mem. op.).  The applicable federal statute and regulations mandate that public housing authority leases contain provisions for automatic renewal.  *See* 42 U.S.C.A. § 1437d(l)(1) (West 2012) (requiring that leases "shall be automatically renewed for all purposes"); 24 C.F.R. § 966.4(a)(2)(1) (2014) (specifying that public housing leases "must be automatically renewed"); *see also Sager*, 855 F. Supp. 2d at 532 ("Leases in public housing are 'automatically renewed' on an annual basis, . . . and cannot be terminated by a PHA except for 'serious or repeated violation of the terms or conditions of the lease or for other good cause.'").  A public housing tenant is entitled to due process protection

8

of the right to remain in his or her housing. *See Sager*, 855 F. Supp. 2d at 532 (citing *Caulder v. Durham Hous. Auth.*, 433 F.2d 998, 1003 (4th Cir. 1970)).[3]

Forcible Detainer

The purpose of a forcible detainer action is to determine who has the right to possession of the premises. *Marshall v. Hous. Auth. of San Antonio*, 198 S.W.3d 782, 785 (Tex. 2006); *Ortegon v. Hous. Auth. of Bexar Cnty.*, No. 04-12-00546-CV, 2014 Tex. App. LEXIS 4601, at *6 (Tex. App.—San Antonio Apr. 30, 2014, no pet.) (mem. op.). To prevail in a forcible detainer action, the plaintiff must present sufficient evidence of ownership to demonstrate its superior right to immediate possession. *Ortegon*, 2014 Tex. App. LEXIS 4601, at *6 (citing *Dormady v. Dinero Land & Cattle Co., L.C.*, 61 S.W.3d 555, 557 (Tex. App.—San Antonio 2001, pet. dism'd w.o.j.) (op. on reh'g), and *Rice v. Pinney*, 51 S.W.3d 705, 709 (Tex. App.—Dallas 2001, no pet.)). A plaintiff may demonstrate a superior right to possession by showing that it is entitled to evict the tenant for cause, such as a violation of the terms of the lease. *See id.*; *Hinojosa v. Hous. Auth. of Laredo*, 940 S.W.2d 763, 765–66 (Tex. App.—San Antonio 1997, no writ).

---

[3] Heinert contends that the issue of his possession of the apartment is not moot. Since the time he filed his brief, the Houston-Fourteenth court decided a similar mootness issue in *Geters*, 430 S.W.3d 581–83. The *Geters* court held that a HUD-subsidized tenant's appeal from a forcible detainer judgment, including the contention she did not receive proper statutory notice to vacate, was not moot, although the initial lease term had expired and she had vacated the premises. *See id.* at 583. Geters also challenged whether the landlord gave the notice of the grounds for termination required under the lease. *See id.* at 582 n.6. Accordingly, pursuant to the right to automatic renewal, Geters asserted a claim to current possession of the premises by effectively contending the lease was never properly terminated in the first place. *See id.* at 580 n.9; *see also Briones v. Brazos Bend Villa Apts.*, No. 14-12-01125-CV, 2014 Tex. App. LEXIS 7093, at *10–11 (Tex. App.—Houston [14th Dist.] July 1, 2014, no pet. h.). Here, Heinert lodges a similar contention to that raised in *Geters*, a claim to the right of current possession pursuant to the automatic renewal provision applicable under the governing statutory scheme. Consequently, we do not treat the issue of current possession as moot. Likewise, WFHA has not responded to Heinert's preemptive mootness argument.

If the plaintiff in a forcible detainer action is a federally-regulated PHA, federal regulations impose certain requirements on PHA leases and also permit eviction in certain circumstances. *See* 24 C.F.R. § 966.4(l)(2) (outlining general grounds for termination of tenancy); *Ortegon*, 2014 Tex. App. LEXIS 4601, at *6–7 n.2. "The lease must provide that any criminal activity by a covered person that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents (including PHA management staff residing on the premises) or threatens the health, safety, or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the premises is grounds for termination of tenancy." 24 C.F.R. § 966.4(l)(5)(ii)(A) (specifically covering eviction for criminal activity). "The PHA may evict the tenant by judicial action for criminal activity in accordance with this section if the PHA determines that the covered person has engaged in the criminal activity, regardless of whether the covered person has been arrested or convicted for such activity and without satisfying the standard of proof used for a criminal conviction." *Id.* § 966.4(l)(5)(iii).

Terroristic Threat

Under the pertinent portion of the Texas Penal Code, a person commits an offense if he threatens to commit any offense involving violence to any person or property with intent to place any person in fear of imminent serious bodily injury. TEX. PENAL CODE ANN. § 22.07 (West 2011). In order to commit this offense of terroristic threat under Subsection (2), "the accused must have the specific intent to place any person in fear of imminent serious bodily injury." *Walker v. State*, 327 S.W.3d 790, 794 (Tex. App.—Fort Worth 2010, no pet.) (quoting *Dues v. State*, 634 S.W.2d 304, 305–06 (Tex. Crim. App. [Panel Op.] 1982)). Intent can be inferred from the acts, words, and

10

conduct of the accused. *Id.* However, we cannot determine the accused's intent merely from what the victim thought at the time of the offense. *See id.* Indeed, for this offense to be complete it is not necessary that the victim or anyone else was *actually* placed in fear of imminent serious bodily injury. *Dues*, 634 S.W.2d at 305. Additionally, it is immaterial to the offense whether the accused had the capability or the intention to carry out his threat. *Id.* The offense is complete if the accused, by his threat, sought as a desired reaction to place a person in fear of imminent serious bodily injury. *See id.* at 306.

A threat is defined as "a declaration of intention or determination to inflict punishment, loss or pain on another, or to injure another by the commission of an unlawful act." *Cook v. State*, 940 S.W.2d 344, 347 (Tex. App.— Amarillo 1997, pet. ref'd). Put another way, a "threat" is a "communicated intent to inflict harm or loss on another or on another's property." BLACK'S LAW DICTIONARY 1618 (9th ed. 2009); "Imminent" means "near at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous." *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989) (en banc) (quoting BLACK'S LAW DICTIONARY 676 (rev. 5th ed. 1979)); *see In re A.C.*, 48 S.W.3d 899, 904 (Tex. App.—Fort Worth 2001, pet. denied).

Reasonable Accommodation

Under the Fair Housing Act (FHA), discrimination against a person on the basis of his or her handicap is an unlawful practice. *See Richardson v. SV Almeda I L.P.*, No. 01-11-01004-CV, 2013 Tex. App. LEXIS 11111, at *15 (Tex. App.—Houston [1st Dist.]

Aug. 29, 2013, no pet.) (mem. op.). More specifically, "it shall be unlawful . . . [t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . that buyer or renter." 42 U.S.C.A. § 3604(f)(1)(A) (West 2012). "Discrimination" includes "a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodation may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B).

The general concept of the reasonable accommodation doctrine is that, at times, a landlord may be required to make modifications to his policy, practices, or property for a disabled tenant, when doing so would give the tenant an "equal opportunity to use and enjoy a dwelling." *See id.*; *Giebeler v. M&B Assocs.*, 343 F.3d 1143, 1149 (9th Cir. 2003). The concept of "reasonable accommodation" requires a balancing of the interest of and benefit to the disabled individual against the interest of and burden to the PHA in making such accommodations. *See Robinson v. City of Friendswood*, 890 F. Supp. 616, 621 (S.D. Tex. 1995) (citing *Oxford House, Inc. v. City of Va. Beach*, 825 F. Supp. 1251, 1261 (E.D. Va. 1993)). A reasonable accommodation does not mean that the PHA must implement "changes, adjustments, or modifications to existing program . . . that would constitute fundamental alteration in the nature of the program." *Solberg v. Majerle Mgmt.*, 879 A.2d 1015, 1024 (Md. 2005) (quoting *Bryant Woods Inn, Inc. v. Howard Cnty, Md.*, 124 F.3d 597, 604 (4th Cir. 1997)).

When an accommodation is being requested to address violent or assaultive behavior, the burden of proving the requested accommodation is reasonable is necessarily a very high one. *See Super v. J. D'Amelia & Assocs., LLC*, No. 3:09cv831

(SRU), 2010 U.S. Dist. LEXIS 103544, at *18–19 (D. Conn. Sept. 30, 2010). This is so because making adjustments necessitated by the criminal activity of another are ordinarily not reasonable and, therefore, are only required in unusual circumstances. *Id.*

Further, no reasonable accommodation need be made for a tenant who was properly evicted for making threats if those threats were not causally linked to his disability. As a general rule, federal laws requiring reasonable accommodations for the disabled "all require a causal nexus between the plaintiff's disability and the underlying basis for terminating the tenancy before the duty to consider a reasonable accommodation arises." *Sinisgallo*, 865 F. Supp. 2d at 339–40; *see Huberty v. Washington Cnty. Hous. & Redev. Auth.*, 374 F. Supp. 2d 768, 773 (D. Minn. 2005) (order); *Boston Hous. Auth. v. Bridgewaters*, 898 N.E.2d 848, 859–60 (Mass. 2009). With that, to determine whether a plaintiff has shown that a reasonable accommodation "may be necessary" to afford that plaintiff an equal opportunity to use and enjoy a dwelling under the FHA, courts must determine whether "there is a causal link between the disability for which the accommodation is requested and the misconduct that is the subject of the eviction or other challenged action." *Sinisgallo*, 865 F. Supp. 2d at 339–40 (quoting *Bridgewaters*, 898 N.E.2d at 859–60); *see Brooker v. Altoona Hous. Auth.*, No. 3:11-CV-95, 2013 U.S. Dist. LEXIS 82228, at *52 n.15 (W.D. Pa. June 12, 2013) (citing *Sinisgallo* for proposition that tenant must show that her behavior forming the basis of the eviction was attributable to her disability); *Evans v. UDR, Inc.*, 644 F. Supp. 2d 675, 690 (E.D.N.C. 2009) ("In order for an accommodation to be deemed 'necessary,' there must be some causal connection between the proposed accommodation and the equal opportunity to be afforded the person with a disability.").

Standards of Review

Findings of fact in a bench trial have the same force and dignity as a verdict on jury questions and are reviewed for legal and factual sufficiency of the evidence by the same standards. *See Compass Bank v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 851 (Tex. App.—Dallas 2005, pet. denied) (citing, *inter alia*, *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994), and *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam)). We review the trial court's legal conclusions *de novo*. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

When examining a legal sufficiency challenge, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *Id.* at 827. The evidence is legally sufficient if it would enable a reasonable and fair-minded person to reach the verdict under review. *Id.* There is "no evidence" or legally insufficient evidence when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *See id.* at 810. We "consider [the] evidence in the light most favorable to the [finding], and indulge every reasonable inference that would support it." *Id.* at 822. The fact-finder is the sole judge of witness credibility and the weight to give their testimony. *See id.* at 819.

In a factual sufficiency review, we consider and weigh all the evidence, both supporting and contradicting the finding.  *See Ortiz*, 917 S.W.2d at 772; *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998).  We set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.  *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).  If the appellant did not have the burden of proof on the adverse finding, the appellant must show the evidence is insufficient to support the finding.  *Johnson v. Waters at Elm Creek L.L.C.*, 416 S.W.3d 42, 47 (Tex. App.—San Antonio 2013, pet. denied).  We may not substitute our own judgment for that of the trier of fact or pass upon the credibility of the witnesses.  *See Ellis*, 971 S.W.2d at 407; *Houston Hous. Auth. v. House*, No. 14-10-00574-CV, 2011 Tex. App. LEXIS 6569, at *4 (Tex. App.—Houston [14th Dist.] Aug. 18, 2011, no pet.) (mem. op.).

Analysis

Terroristic Threat: Sufficiency of the Evidence

In his first and second points of error, Heinert contends that "[t]he trial court erred in finding that Heinert committed a terroristic threat because there was legally insufficient evidence of the required element of intent" and that "[t]he trial court erred in finding that Heinert committed a terroristic threat because there was factually insufficient evidence to conclude that Heinert's statements were a threat."

In a case presenting similar issues, our sister court in San Antonio considered whether a resident's threats to office workers constituted a terroristic threat such that the resident's eviction was proper under the federally-regulated lease.  *See Ortegon*,

15

2014 Tex. App. LEXIS 4601, at *9–10.  Ortegon, a public-housing resident went to the management office upset and yelling at office employees about the failure to timely and properly fix her air conditioner; she had received an extraordinarily high electric bill, she claimed, as a result of the still faulty air conditioner.  *See id.* at *1–2.  As Ortegon began to leave the office, she said something to the effect that the office employees "were lucky she did not have a gun because she would start shooting" or "As upset as I am right now, you're lucky I don't have a gun or I would start shooting people."  *See id.* at *2.  The two employees testified that Ortegon's statement made them believe that she was threatening their safety and each of them was afraid of immediate harm.  *See id.* at *9.  One of the employees testified that she was so afraid that she immediately called police.  *See id.* at *10.  Ortegon initially denied making the statement, but later testified that, even if she had made such a statement, it was not intended to be threatening, but would have been more of a "figure of speech."  *See id.*  The San Antonio court rejected Ortegon's contention and concluded that sufficient evidence supported the conclusion that her statements to the employees constituted a terroristic threat as defined by the Texas Penal Code.  *See id.* at *10; *see also* TEX. PENAL CODE ANN. § 22.07.

We look now to the record before us to determine whether, like Ortegon's comment, Heinert's remarks to the WFHA constituted terroristic threats.  Heinert's challenge to the legal sufficiency of the evidence focuses on the element of intent, suggesting that, when he uttered those words to the WFHA staff he did not have the requisite intent.  To explore this element, we will look for evidence relating to the choice of words, body language, and tone of voice as those aspects are relevant to the element of intent.  *See Ramirez v. State*, No. 13-10-00462-CR, 2011 Tex. App. LEXIS

16

3080, at *8 (Tex. App.—Corpus Christi Apr. 21, 2011, no pet.) (mem. op., not designated for publication). Our analysis also must include all inferences available to the fact-finder, including the circumstances surrounding Heinert's alleged threats to the staff and his conduct surrounding the threat of violence. *See Williams v. State*, No. 04-13-00386-CR, 2014 Tex. App. LEXIS 4109, at *10 (Tex. App.—San Antonio Apr. 16, 2014, no pet.) (citing *Dues*, 634 S.W.2d at 305); *see also Welch v. State*, 880 S.W.2d 225, 226 (Tex. App.—Austin 1994, no pet.) (per curiam) (determining whether "the words and conduct of the accused were sufficient to place a reasonable person in the victim's circumstances in fear of imminent bodily injury or death").

Here, we have at least two instances during which Heinert made threats directed at WFHA employees. We begin with the message he left on Piper's voicemail in late October 2012. Without question, its tone is menacing when he speaks of other people getting killed. He voiced his dissatisfaction with certain practices of WFHA employees and instructed the WFHA staff to leave his bank account alone. He further threatened that there would be bullets through WFHA trucks, suggesting that the entire staff was at risk. We do note that, because the message was left by way of voicemail, there was at least some amount of inherent distance placed between the threat and its recipient. That is not to say that it was not a terroristic threat; we only note that we have considered this particular aspect in evaluating Heinert's intent in leaving the message. Nonetheless, the content of the message included angry complaints, instructions, and threatening language, communicating to the recipients that Heinert intended "to inflict harm or loss on another or on another's property." *See* BLACK'S LAW DICTIONARY 1618.

17

We also must consider the in-office meeting with Heinert in mid-November. This, unlike other meetings WFHA staff had arranged with Heinert, was not scheduled, and no one accompanied him to the meeting. Heinert came by the office unannounced and of his own accord, and he was "very upset" at the prospect of being evicted. Though it is immaterial to the offense whether the accused had the capability or the intention to carry out his threat we note that, compared to the threats in *Ortegon*, Heniert's statements here seem even less equivocal. *See Ortegon*, 2014 Tex. App. LEXIS 4601, at \*2. In *Ortegon*, our sister court concluded and we agree that Ortegon's threat to the staff constituted a terroristic threat within the meaning of the Texas Penal Code provision, even when she included information in her threats suggesting she did not have a gun at the very moment she issued the threat. Whereas Ortegon suggested in her threats to the employees that she did *not* have a gun at the moment, Heinert did not make such a suggestion. There is no evidence that he represented to the staff that he *did* have a gun either, but Piper testified that she knew him to have possessed a gun in the past; there was certainly nothing Heinert said that would have suggested to the staff that he did *not* have a gun at his disposal. In light of his words, his demeanor, and the general topic at issue, we conclude that all that was necessary to complete the offense was shown: by his threat, Heinert sought as a desired result to place the WFHA employees in fear of imminent serious bodily injury. *See Walker*, 327 S.W.3d at 794; *see also Ramirez*, 2011 Tex. App. LEXIS 3080, at \*7–9; *see also* TEX. PENAL CODE ANN. § 22.07.

Heinert contends that, because he ended the telephone message with a pleasantry and well wishes, he could not have intended to threaten the WFHA staff. To

18

accept such a contention would be to ignore the remainder of the message and to overlook the context in which it was left and the overall impact it was designed to have. *See Cook*, 940 S.W.2d at 348–49 (observing that "it would be an intellectual injustice and a farce for us to methodically dissect the messages word by word, and phrase by phrase to determine some ratio of conditional to non-conditional language"). Indeed, in *Cook*, this Court examined similarly composed voicemail messages wherein the appellant left unquestionably threatening messages—"this is a g*d damn threat"—but concluded the messages with pleasantries such as "[t]hank you very much" and "you have a wonderful day." *See id.* at 346.

Having reviewed the evidence under the applicable standards of review, we conclude that (1) the evidence is legally sufficient to support the trial court's implied findings that Heinert made the comments to WFHA both by way of telephone and in person with the requisite intent such that his comments "were criminal in nature" and constituted terroristic threats and (2) the evidence is factually sufficient to support the trial court's finding that Heinert's comments to the WFHA staff "constituted a threat to the safety of the [WFHA] staff." Further, based on those findings, the trial court correctly concluded that Heinert's conduct constituted the offense of terroristic threat, which, in turn, constituted criminal activity that threatened the safety of the WFHA staff. Because the lease between Heinert and WFHA specifically prohibited this type of criminal activity and such a prohibition was authorized by the federal regulations governing the lease between the parties, WFHA was within its rights to terminate the lease. Being clothed in such a right, WFHA demonstrated that it had a superior right to possession of the

19

premises previously occupied by Heinert. *See Ortegon*, 2014 Tex. App. LEXIS 4601, at *10; *Marshall*, 198 S.W.3d at 785; *Dormady*, 61 S.W.3d at 557.

Reasonable Accommodation: Application of Appropriate Standard

By his first request to WFHA, Heinert "request[ed] that WFHA grant a reasonable accommodation of his disability by not evicting him from public housing and allowing him to implement a plan to minimize the difficulties he has had in the past." So, the accommodation requested consisted of WFHA abandoning the eviction proceedings in favor of "a mutually agreeable action plan" and permitting Heinert to remain as a tenant at his apartment. In his letter, Heinert's counsel explained that Heinert suffered from schizophrenia and had recently begun a new medication that would allow him to "better manage" his disease.

In his sixth point of error, Heinert contends that "[t]he trial court erred in finding that Heinert could be evicted after requesting a reasonable accommodation because the trial court did not apply the appropriate standard in evaluating a reasonable accommodation defense in an eviction." The trial court found that WFHA "attempted to attain a reasonable accommodation with [Heinert] on November 13, 2012[,] and on November 26, 2012," but "[n]o reasonable accommodation was attained." The trial court concluded that "[e]ven though [WFHA] sought to attain a reasonable accommodation, the Court further concludes that [WFHA] is not required to attempt to attain a reasonable accommodation with regard to a direct threat to the safety of others that cannot be eliminated by a modification of policies, or procedures, or by the

20

provision of auxiliary aids or services." Notably, the trial court "further conclude[d] that this eviction action was not based on any disability of [Heinert]."

As we have noted, the appropriate standard applicable to a reasonable accommodation claim requires that, to establish his reasonable accommodation claim, Heinert must have shown that his tenancy was terminated by reason of his disability by establishing that, but for Heinert's mental illness, he would not have needed a reasonable accommodation to the otherwise neutral terms of the lease and his tenancy would not have been terminated. *See Sinisgallo*, 865 F. Supp. 2d at 340 (citing *Super*, 2010 U.S. Dist. LEXIS 103544, at *35). This nexus requirement called on Heinert to show that his tenancy was terminated "by reason of" something caused by his disability. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 277 (2nd Cir. 2003); *Sinisgallo*, 865 F. Supp. 2d at 340. Absent such a showing of an identifiable relationship between the requested accommodation and Heinert's disability, no theoretically available accommodation is "necessary." *See Book v. Hunter*, No. 1:12-cv-00404-CL, 2013 U.S. Dist. LEXIS 39869, at *8–9 (D. Or. Mar. 21, 2013). Thus, for Heinert to prevail on his reasonable accommodation contention, he must establish that his threats to WFHA staff are traceable, or causally linked, to his alleged disability.

Aside from the general diagnosis of schizophrenia represented by Heinert's counsel in the accommodation request as the mental illness from which Heinert suffers, nothing in the record definitively identifies the nature of his disability. We hear of his conduct, tendencies, and interactions with fellow residents, but we never really see developed the precise nature, severity, limitations, or breadth of his disability. Consequently, we do not see where Heinert has linked his disability to the conduct

forming the basis of WFHA's decision to evict him for violating the terms of his lease by engaging in criminal activity that threatened the WFHA staff. We do learn that, under the care of the Helen Farabee Center, Heinert must have been diagnosed at some point with one of the three major mental illnesses with which the center deals: major depression, psychotic disorders, and bipolar disorder. Again, though, the record does not reveal the severity or nature of Heinert's mental illness or how his resulting disability is causally linked to his threats of violence against WFHA staff.

What we do discover from the record suggests that Heinert's threats were not at all related to his disability and were, in fact, entirely inconsistent with the conduct his mental health case manager, Teruel, described as typical for him. Teruel, who was familiar with Heinert's "mental disabilities," described him as a "very talkative" man capable of being a bit of a "nuisance" who could become overly involved in his neighbors' lives and who was "disorganized" and tended to ramble on, sometimes incoherently and sometimes about paranoid ideations. Teruel testified unequivocally several times that she did not consider Heinert potentially dangerous, that she never felt threatened by him. To the contrary, she testified that she had never witnessed Heinert exhibit any violent outbursts. Further, she had no concern that he would ever make a threat against another person, and, in her opinion, he did not pose a threat to either the WFHA staff or fellow residents. She acknowledged that she had a duty to report if Heinert became a danger to himself or others but explained that she had never had to make such a report because she never perceived him as a danger to anyone.

Teruel did identify Heinert as having a social skills "gap" which can cause him to act inappropriately close to others when others do not wish to be so close to him. So,

while it *may* well be that Heinert's often awkward, and, at times, alarming interaction with his neighbors could arguably be connected to Heinert's disability in understanding boundaries in social settings, nothing in Teruel's testimony would suggest that Heinert's threats of violence against the staff were causally related to his disability or disabilities. The record fails to establish the causal link between the conduct forming the factual basis of the eviction and Heinert's disability, meaning that his tenancy was not terminated as a result of his disability but, instead, was terminated as a consequence of his failure to abide by the rules imposed by the lease:

> [T]he policy of evicting tenants who violate provisions of their lease does not prevent disabled tenants from using the premises *because of their disability*. Rather, these tenants are prevented from using the premises because they violated their lease. There is thus no link between this policy and [the tenant's] disability.

*Garcia v. Alpine Creekside, Inc.*, No. 13-CV-259-MMA (JMA), 2013 U.S. Dist. LEXIS 89227, at *16 (S.D. Cal. June 25, 2013) (order).

Having outlined "the appropriate standard" to be applied to a reasonable accommodation claim and having reviewed the evidence, we conclude that the trial court applied the correct standard to Heinert's reasonable accommodation claim and, because the record fails to establish the requisite nexus between the complained-of behavior and the decision to seek eviction based on violation of lease provisions, the trial court properly concluded that termination of the lease and the subsequent eviction action was "not based on any disability of Heinert." We overrule Heinert's contention that the trial court misapplied the law and incorrectly came to the conclusion as to his reasonable accommodation claim. Based on our disposition of Heinert's first, second,

23

and sixth points of error, his remaining points of error become unnecessary to the final disposition of his appeal and we need not address them. *See* TEX. R. APP. P. 47.1.

Conclusion

Having overruled Heinert's points of error on appeal, we affirm the trial court's judgment. *See* TEX. R. APP. P. 43.2(a).

Mackey K. Hancock
Justice