

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-19-00563-CV

Miriam **LEDEZMA**,
Appellant

v.

**LAREDO HOUSING AUTHORITY**,
Appellee

From the County Court at Law No. 1, Webb County, Texas
Trial Court No. 2018CVD000029L1
Honorable Hugo D. Martinez, Judge Presiding

Opinion by: Liza A. Rodriguez, Justice

Sitting: Rebeca C. Martinez, Chief Justice
Patricia O. Alvarez, Justice
Liza A. Rodriguez, Justice

Delivered and Filed: March 31, 2021

REVERSED AND REMANDED

Miriam Ledezma appeals from the trial court's judgment ordering her eviction from the Ana Maria Lozano public housing complex in Laredo, Texas. On appeal, she argues (1) the trial court lacked subject-matter jurisdiction because the Laredo Housing Authority failed to comply with statutory notice requirements; and (2) because evidence relating to conduct protected by the First Amendment cannot form the basis of her eviction, the evidence is legally and factually insufficient to support the trial court's judgment. Because we hold the evidence is legally insufficient to support the trial court's finding that Ledezma should be evicted, we reverse the trial

court's judgment. In accordance with Ledezma's request in her brief, we remand the cause to the trial court for proper disposition.

## BACKGROUND

For over fifteen years, Miriam Ledezma has lived at the Ana Maria Lozano complex, a federally-subsidized housing project operated by Laredo Housing Authority ("LHA"). On February 1, 2017, Ledezma received a notice of termination of lease, accusing her of "repeatedly threatening the rights of other tenants to the peaceful enjoyment of their community facilities and the social environment of their Housing Project, as called for by Section IX (l) and (m) of the Lease." According to the notice, Ledezma was specifically accused of "aggressively disrupt[ing] activities at the recreational facilities of the Ana Maria Lozano Housing Project on November 10, 2016, preventing the enjoyment of these community facilities by other residents of the Housing Project." On October 31, 2017, Ledezma received another notice of termination stating that because "the reason for the proposed eviction involve[d] a threat to the health, safety and rights of peaceful enjoyment of the premises by [her] neighbors," she was not entitled to a grievance hearing. The notice further stated that LHA would "file proceedings in state court to evict [her] from the premises." On April 12, 2018, Ledezma was sued for forcible entry and detainer. The justice of the peace court ordered her to vacate her housing unit. Ledezma appealed to the county court, which heard the case de novo.

At the bench trial before the county court, there was testimony about an incident that occurred on November 10, 2016 at a tenants' council meeting. Martha Trevino, a fifty-eight-year-old resident of the Ana Maria Lozano Housing Complex, testified about Ledezma's behavior at meetings:

> She was always—we always have our meetings, but she would start talking too much or she wouldn't let people talk to whatever [sic] they wanted to ask. She was

always the one [who] would be speaking. Or the special—well she would say, "I'm speaking for the people," but she always start [sic] something, argues.

When asked how Ledezma was disruptive, Trevino responded,

She always likes to interrupt. She would ask questions, but all of a sudden she would start arguing with the persons [who] were [on] the council or the ones [who] would go visit us and talk about like—about stuff for the colonia that we needed. . . . Well, she would start arguing with everybody, especially with the oldest people—old people.

Trevino testified that at one meeting, Ledezma said that the elderly in the housing project should live in another housing project because they were not supposed to be living at the Ana Maria Lozano Housing project. According to Trevino, at the tenants' council meeting, Ledezma stated that another tenant did not want any children at the bingo. According to Trevino, the other tenant, who was an elderly woman, responded that the parents should keep the children quiet so people can hear the numbers being called. Trevino testified that Ledezma and the woman began arguing. The next day at bingo, Ledezma stood up from her seat and started clapping her hands, saying "We got [sic] an old people [sic] [who] doesn't want the kids here." Trevino testified the other tenant became embarrassed.

Trevino testified she had lived next to Ledezma for five years and admitted to never having a problem with her. When asked why she had complained about Ledezma, Trevino testified her complaint stemmed from the police being called at the tenants' council meeting on November 10, 2016. Trevino testified that the police were called because Ledezma "was threatening everybody." Trevino, however, could not point to exactly how Ledezma was "threatening everybody." She admitted that the police did not arrest Ledezma because "[t]here was no violence." Trevino also testified she had not been afraid of Ledezma: "Why should I be afraid of her?" So, when asked exactly how Ledezma's behavior threatened Trevino's health, Trevino testified, "Because every time we do stuff I get sick sometime. Like right now, I'm in bad health right now, and I am here

to testify because I want to because she gets so rowdy at the meetings." When asked why the police were called to the tenants' council meeting, Trevino testified, "What happens with Ms. Ledezma [is] she doesn't say bad words, but she says it in another different way." Trevino claimed Ledezma was threatening because "[s]he wants to humiliate people in a way that it feels very bad." Trevino stated that Ledezma "screams a lot." But, when asked to clarify whether Ledezma said something along the lines of "You're going to get it," or "I'm going to take care of you," Trevino admitted Ledezma had not said anything of that sort.

Angelica Hernandez, a resident of fifteen years at the Ana Maria Lozano housing complex, was also present at the November 2016 tenants' council meeting. She testified that at the meeting, Ledezma "started yelling at the ladies, the elderly ladies" who were on the board, telling them that they should not be living at the Ana Maria Lozano housing and should instead be at Retama housing. According to Hernandez, Rosa Rodriguez, an elderly tenant "told Miriam not to get involved, and [Ledezma] started yelling at her." Hernandez testified that Rodriguez then called the police. After the police talked to Rodriguez, the officers told Ledezma to leave and Ledezma complied.

Sixty-seven-year-old Yolanda Martinez has been a resident of Ana Maria Lozano for eight years and is the president of the board of the tenants' council. She testified that at the meeting in November 2016, Ledezma said she did not want the older members of the board living at Ana Maria Lozano because they were too old. Martinez testified Ledezma was screaming with a notebook and pen in her hand and was asking for tenants to sign her petition. Martinez described Ledezma as "very aggressive" due to her "screaming." Then, according to Martinez, everybody was screaming and "getting very aggressive." Martinez testified Ledezma would not allow anyone to speak and the meeting was cancelled. Martinez also testified about Ledezma's behavior at bingo:

For example, there was a resident, Rosie Rodriguez. She was calling the cards and asking for silence because the children were running around. And this is an example that—how [Ledezma] started scream, "Hey, hey, hey. This woman doesn't like the children," calling attention like that to everybody like that.

Martinez testified that she and a few other residents filed a peace bond against Ledezma. That case, however, was dismissed for lack of evidence. On cross-examination, Martinez admitted that as recently as April 13, 2019, she sold a loteria (bingo) ticket to Ledezma.

Maria Guadalupe Macias testified she is a friend of Martha Trevino and attends social functions hosted by the tenants' council at Ana Maria Lozano. She testified about an incident during a loteria where Ledezma confronted Rodriguez. According to Macias, Ledezma started yelling at Rodriguez and another tenant, telling them they did not belong at Ana Maria Lozano because Rodriguez had two apartments and that she should move to another smaller unit in a different housing project. Macias testified that Rodriguez "started shaking, and she just didn't know what to do." Macias testified that Ledezma was "always put[ting] down the elderly." According to Macias, Ledezma "and her group . . . make a lot of noise and they talk and they laugh and they scream leaving the kids running and going." Rodriguez would ask the group to be quiet because she could not hear the loteria. But when asked about Ledezma's specific conduct at the November 2016 meeting when the police were called, Macias admitted there had not been any violence—all Ledezma had done was scream at Rodriguez at the meeting.

Ledezma testified that she had been a resident of the Ana Maria Lozano housing project for fourteen years. Ledezma was actually elected president of the tenants' council by the other tenants and served for three years. Her term expired in April 2016. Ledezma testified about what happened at the November 2016 tenants' council meeting:

The way I see it, it's a meeting—they were present, the manager Rosie Ortiz from housing. I'm not in agreement [with what] they're saying [that] I scream too much, that I am disrespectful because at a meeting, the way I understand, to be able to talk at a meeting is you have to raise your hand, and then they give you permission to

> talk. So then if Rosie Ortiz, manager of the Laredo Housing Authority, is present, if she is watching that I'm screaming to the people, the contract says that she has to give me a violation, and it's called "contract violation," because they've always told us that if you have more than three violations, automatically they will ask you for your house. The meetings always last one hour. And if I talk too much and I raise my voice—yes, I do talk loud—but that's because they allowed me to talk. I've been present at the meetings for eighteen years. Because I've been there for eighteen years and I've always [gone] to the meetings—I have to—because if HUD comes and they look at the contract in the meetings, they're going to say that I'm not complying with the meetings, that I'm not being present in the meetings.

Ledezma testified that tenants' council meetings last for an hour and someone from LHA is always present. According to Ledezma, at the November 2016 meeting, she proposed policy changes:

> The conversation was—and I did say—and I raised my hand and they allowed me to talk, and I said why not to make two board of directors, one for the people—the elderly people, and another one—one board for the elderly people and another board for the mothers that have children that are disabled or with handicaps . . . or whatever because it's very different.

Ledezma testified that in her opinion, she was not rude, but she admits that she has a loud voice.

When asked why Ledezma wanted two groups, she responded,

> Because the elderly, if they play loteria, they're going to be peaceful. There will be no children running and screaming and spilling Cokes or anything. And the ones on the other board, like the mothers with children with disabilities, like I said before, I didn't—because, like, the mothers with children with disabilities, yes, I do, like, at the loteria talk loud and to make a lot of fuss, yes, because when I win a prize I yell and scream and clap and I say, "Yes, I won."

Ledezma testified she was not arrested or detained after the November 2016 meeting, nor has she ever been arrested. She testified she still attends all the meetings and tenants' council events. Ledezma stated that on April 13, 2019, Martinez asked for her help in selling tickets for loteria, giving her five tickets to sell. According to Ledezma, she is always asked to sell tickets because she is the resident who sells the most tickets. She testified she still interacts with Martinez and Trevino at bingo. When asked if she could afford to pay rent at a private home, Ledezma testified she could not because her children are disabled. She testified her income is $750 per month for her

disabled child, $200 per month in food stamps, and $100 per month for TANIF. She does not receive child support. She pays $337 in rent at Ana Maria Lozano.

Josefina Negrete testified she has known Ledezma for five years and met her because of bingos and other events hosted by the tenants' council. Negrete testified Ledezma is "a very happy person" and "has a very loud voice." "So when she wins—when she wins she claps and she gets very happy because she won." Another friend of Ledezma, Jacinto Villagomez Lozano, testified that Ledezma is "very playful" and when someone arrives to bingo, "the first thing that she does is she stands up and starts clapping, or when she wins also." "And she says right away, 'get the money and get to the next one.'"

Maria Ortiz, project manager of Ana Maria Lozano since September 2016, testified that she was present at the November 2016 tenants' council meeting. According to Ortiz, when the meeting started, Ledezma and "several other ladies started quarreling." Ortiz "didn't get the full picture because everybody was shouting." Ortiz testified that she knew Rosa Rodriguez had heart problems and saw Rodriguez become "very overactive." When asked to explain the sequence of events, Ortiz testified Ledezma began shouting when someone mentioned "changing events or doing an event." "Ms. Ledezma started shouting [at] Ms. Rodriguez." Ortiz testified she had only been a manager at Ana Maria Lozano since September 2016, so she did not know all the people present. Ortiz testified Ledezma was not shouting vulgarities, but Ortiz felt Ledezma was being "disrespectful" to the elderly tenants. According to Ortiz, four of the elderly tenants (Clara Ybarra, Raul Martinez, Rosa Rodriguez, and Martha Trevino) complained that Ledezma was being "disrespectful" to the elderly.

After the bench trial, the trial court found that Ledezma breached Sections IX(l) and (m) "of her Residential Lease Agreement by threatening the rights of other tenants to the peaceful enjoyment of their community facilities and the social environment of their housing project."

"Specifically Ledezma disrupted activities at the recreational facilities of the Ana Maria Lozano Housing Project on November 10, 2016, and caused breaches of the peace on other occasions, preventing the enjoyment of the facilities by other residents of the Housing Project." Ledezma appealed.

## INADEQUATE NOTICE AND SUBJECT-MATTER JURISDICTION

As a federally-subsidized housing authority, Laredo Housing Authority is governed by the United States Housing Act of 1937 and its attendant regulations. *See* 42 U.S.C. §§ 1437–1437z–10; *Heinert v. Wichita Falls Hous. Auth.*, 441 S.W.3d 810, 816 (Tex. App.—Amarillo 2014, no pet.); *Geters v. Baytown Hous. Auth.*, 430 S.W.3d 578, 582 (Tex. App.—Houston [14th Dist.] 2014, no pet.). "The operation of public housing by [public housing authorities] is subject to comprehensive federal regulation." *Heinert*, 441 S.W.3d at 816 (quoting *Sager v. Hous. Comm'n*, 855 F. Supp. 2d 524, 531 (D. Md. 2012)) (alteration in original). "Among other things, federal law dictates much of the content of public housing leases, requiring the inclusion of various provisions and prohibiting other provisions." *Id*. (quoting *Sager*, 855 F. Supp. 2d at 531).

Ledezma argues the trial court lacked subject-matter jurisdiction because the Laredo Housing Authority did not comply with federal regulations in proceeding with the eviction suit. Specifically, Ledezma argues she was not given adequate notice. Federal regulations require a lease to state the procedures to be followed by the public housing authority and by the tenant "to terminate the tenancy." *See* 24 C.F.R. § 966.4(l). However, the public housing authority need not follow its administrative grievance procedure if termination of the tenancy or eviction involves the following:

(A) Any *criminal* activity that threatens the health, safety or right to peaceful enjoyment of the premises of other residents or employees of the PHA [Public Housing Authority];

(B) Any violent or drug-related criminal activity on or off such premises; or

(C) Any criminal activity that resulted in felony conviction of a household member.

24 C.F.R. 966.51(a)(2)(i) (authority derived from 42 U.S.C. § 1437(d)) (emphasis added). At the bench trial, there was no evidence supporting any criminal activity committed by Ledezma. Thus, it is unclear why the LHA believed this exception to the grievance procedure would apply. However, assuming arguendo that this exception was applicable, a public housing authority in not providing a tenant with an administrative grievance procedure must still comply with the notice requirements listed in 24 C.F.R. § 966.4(l)(3)(v):

> (v) When the PHA is not required to afford the tenant the opportunity for a hearing under the PHA administrative grievance procedure for a grievance concerning the lease termination (see § 966.51(a)(2)), and the PHA has decided to exclude such grievance from the PHA grievance procedure, the notice of lease termination under paragraph (l)(3)(i) of this section shall:
>
> > (A) State that the tenant is not entitled to a grievance hearing on the termination.
> >
> > (B) Specify the judicial eviction procedure to be used by the PHA for eviction of the tenant, and state that HUD has determined that this eviction procedure provides the opportunity for a hearing in court that contains the basic elements of due process as defined in HUD regulations.
> >
> > (C) State whether the eviction is for a criminal activity as described in § 966.51(a)(2)(i)(A) or for a drug-related criminal activity as described in § 966.51(a)(2)(i)(B).

24 C.F.R. § 966.4(l)(3)(v).

The record reflects that Ledezma received two letters from the Laredo Housing Authority regarding termination of her lease. The first letter, dated February 1, 2017, stated that Ledezma was being given "notice of the proposed termination of [her] lease effective April 1, 2017, for repeatedly threatening the rights of other tenants to the peaceful enjoyment of their community facilities and social environment of their Housing Project." The letter stated that "[s]pecifcally,

[Ledezma] aggressively disrupted activities at the recreational facilities of the Ana Maria Lozano Housing Project on November 10, 2016, preventing the enjoyment of these community facilities by other residents of the Housing Project." In a letter dated October 31, 2017, the Laredo Housing Authority informed Ledezma that she was not entitled to a grievance hearing: "Since the reason for the proposed eviction involves a threat to the health, safety and rights of peaceful enjoyment of the premises by your neighbors, such a hearing is not required by the [Laredo Housing] Authority's Grievance Procedures."

Ledezma argues that her notice given by the Laredo Housing Authority did not comply with 24 C.F.R. § 966.4(l)(3)(v) because the letters failed to state (1) the specific judicial procedures the Laredo Housing Authority would follow; (2) whether HUD had issued a due process determination; and (3) whether the eviction was for a criminal or drug-related activity. In reviewing the letters, which were admitted at trial, we conclude the October 31, 2017 letter informed Ledezma that if she did not voluntarily vacate, the Laredo Housing Authority would "file proceedings in state court to evict you from the premises." While this language is somewhat conclusory and could be more specific, it did notify Ledezma that any eviction proceedings would be filed in state court. *See Moon v. Spring Creek Apartments*, 11 S.W.3d 427, 433 (Tex. App.—Texarkana 2000, no pet.) ("Termination notices for federally subsidized housing have been found to be insufficient where they contain only one sentence, are framed in vague and conclusory language, or fail to set forth a factual statement to justify termination."). However, whether this language is sufficiently specific need not be resolved in this case as we agree with Ledezma that the letter did not state (1) whether HUD had issued a due process determination and (2) did not state whether the eviction was for a criminal or drug-related activity. Thus, the letter did not comply with the specific notice requirements of 24 C.F.R. § 966.4(l)(3)(v).

Ledezma argues the Laredo Housing Authority's failure to comply with federal notice requirements deprived the trial court of subject-matter jurisdiction. While other jurisdictions have held that inadequate notice deprives a trial court of subject-matter jurisdiction,[1] we find persuasive the analysis by our sister court in *Nealy v. Southlawn Palms Apartments*, 196 S.W.3d 386 (Tex. App.—Houston [1st Dist.] 2006, no pet.). In determining whether inadequate notice would deprive a trial court of subject-matter jurisdiction, the *Nealy* court looked to the Texas Supreme Court's analysis and holding in *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71 (Tex. 2000). In *Dubai*, the supreme court "disapproved of a long line of cases holding that, when a claim is based on a statute, the statutory provisions are mandatory, exclusive, and require compliance in all respects, or the trial court will lack subject-matter jurisdiction." *Nealy*, 196 S.W.3d at 302 (discussing *Dubai*, 12 S.W.3d at 75-77). Instead, the supreme court "sided with the modern trend that treats failure to comply with statutory requirements as defeating a claimant's right to relief, but not defeating the trial court's jurisdiction." *Id*. (discussing *Dubai*, 12 S.W.3d at 76-77). Thus, *Dubai* "and its progeny instruct courts to determine whether the Legislature or Congress intended the statutory requirement to be jurisdictional." *Id*. (citing *Dubai*, 12 S.W.3d at 76, and *Univ. of Tex. Sw. Med. Ctr. v. Loutzenhiser*, 140 S.W.3d 351, 358 (Tex. 2004)).

"One indicator of legislative intent is a statute's purpose." *Id*. (citing *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 494 (Tex. 2001)). The *Nealy* court explained that "the purpose of the notice requirements under HUD is 'to insure that the tenant is adequately informed of the nature of the evidence against him so that he can effectively rebut that evidence.'" *Id*. (quoting *Escalera*

---

[1]Holding that inadequate notice deprives a trial court of subject-matter jurisdiction, these appellate courts have automatically reversed or dismissed trial court judgments without performing a harm analysis. *See Riverview Towers Assocs. v. Jones*, 358 N.J. Super. 85, 88, 90, 817 A.2d 324, 327 (2003); *Hedco, Ltd. v. Blanchette*, 763 A.2d 639, 643 (R.I. 2000); *see also Jackson Terrace Ass'n v. Paterson*, 155 Misc.2d 556, 557, 589 N.Y.S.2d 141, 142 (N.Y. Civ. Ct. 1992); *Cent. Brooklyn Urban Dev. Corp. v. Copeland*, 122 Misc.2d 726, 729, 471 N.Y.S.2d 989, 992 (N.Y. Civ. Ct. 1984); *Bella Vista Apartments v. Herzner*, 125 Ohio Misc.2d 1, 4, 796 N.E.2d 593, 595 (Ohio Mun. Ct. 2003).

*v. New York City Hous. Auth.*, 425 F.2d 853, 862 (2d Cir. 1970)). The *Nealy* court reasoned that "[t]his purpose would not be served by allowing a tenant to assert that a court has no subject-matter jurisdiction over such an action because of an inadequate notice." *Id*. "For instance, assuming that a tenant received a deficient notice, yet effectively rebutted the evidence and prepared a proper defense, dismissing the case based on subject-matter jurisdiction would fail to serve the purpose of the statutory requirement." *Id*. Thus, the *Nealy* court concluded that "an inadequate notice does not deprive a court of subject-matter jurisdiction and that a harm analysis better fulfills the purpose of HUD's specificity requirements." *Id*.

In considering whether the appellant was harmed, the *Nealy* court emphasized that the appellant was represented by counsel and filed an answer and pursued pretrial discovery. *Id*. at 393. Further, the court noted that neither appellant nor her counsel "indicated that they could not prepare a proper defense." *Id*. The court noted that appellant's counsel objected to evidence related to other lease violations "because counsel knew, or was under the impression, that only [the appellant's] alleged mooning of other tenants formed the basis for her eviction." *Id*. Thus, the *Nealy* court held the appellant was not harmed by the inadequate notice. *Id*.

We agree with *Nealy*'s analysis and hold that the Laredo Housing Authority's inadequate notice did not deprive the trial court of subject-matter jurisdiction. Thus, we turn to whether the record shows Ledezma was harmed by the inadequate notice. *See Moon*, 11 S.W.3d at 435 (explaining that in considering whether tenant is harmed by deficient notice, appellate court should consider if the due process goals for required notice were satisfied so as to enable tenant to prepare a defense, to be represented by counsel, to have an opportunity to present evidence, cross-examine witnesses and present a defense, and to have a decision rendered on the merits). Ledezma argues in her reply brief that her "ability to present her case did not come without an effort to convince the trial court to allow discovery before proceeding to a trial on the merits." While she may have

had to make "an effort" to convince the trial court to allow discovery, Ledezma does not argue that she was denied discovery. Indeed, the record reflects that Ledezma was represented by counsel who was able to conduct discovery. Further, the record reflects that Ledezma was notified in a letter dated February 1, 2017 that termination of her lease was being sought for her "repeatedly threatening the rights of other tenants to the peaceful enjoyment of their community facilities and the social environment of their Housing Project, as called for by Section IX (l) and (m) of the Lease." More specifically, the letter notified Ledezma termination of her lease was related to her "aggressively disrupt[ing] activities at the recreational facilities of the Ana Maria Lozano Housing Project on November 10, 2016, preventing the enjoyment of these community facilities by other residents of the Housing Project." At trial, the witnesses testified about this November 10, 2016 incident, and Ledezma's counsel successfully objected to unrelated evidence being introduced. Thus, in reviewing the record, we hold that Ledezma was not harmed by the inadequate notice.

## DISCUSSION

Ledezma argues that the evidence is legally and factually insufficient to support the trial court's findings that she breached her lease. "Findings of fact in a bench trial have the same force and dignity as a verdict on jury questions and are reviewed for legal and factual sufficiency of the evidence by the same standards." *Heinert*, 441 S.W.3d at 819. A trial court's legal conclusions are reviewed de novo. *Id*. "When examining a legal sufficiency challenge, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it." *Id*. at 819-20. "We credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not." *Id*. "The evidence is legally sufficient if it would enable a reasonable and fair-minded person to reach the verdict under review." *Id*. "In a factual sufficiency review, we consider and weigh all the evidence, both supporting and contradicting the finding." *Id*. "We set aside the finding only if it is so contrary to

the overwhelming weight of the evidence as to be clearly wrong and unjust." *Id*. Under either standard of review, the fact-finder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986).

The purpose of a forcible detainer action is to determine who has the right to possession of the premises. *Marshall v. Hous. Auth. of San Antonio*, 198 S.W.3d 782, 785 (Tex. 2006). "To prevail in a forcible detainer action, the plaintiff must present sufficient evidence of ownership to demonstrate its superior right to immediate possession." *Heinert*, 441 S.W.3d at 816. "A plaintiff may demonstrate a superior right to possession by showing that it is entitled to evict the tenant for cause, such as a violation of the terms of the lease." *Id*.

If the plaintiff in a forcible detainer action is a federally-regulated public housing authority, federal regulations impose certain requirements on public housing authority leases and also permit eviction in certain circumstances. *See* 24 C.F.R. § 966.4(l)(2) (outlining general grounds for termination of tenancy); *Heinert*, 441 S.W.3d at 816. In its findings of fact, the trial court found that Ledezma "breached Sections IX (l) and (m) of her Residential Lease Agreements by threatening the rights of other tenants to the peaceful enjoyment of their community facilities and the social environment of their housing project." The trial court found that "[s]pecifically, [Ledezma] *disrupted* activities at the recreational facilities of the Ana Maria Lozano Housing Project on November 10, 2016, and caused breaches of the peace on other occasions, preventing the enjoyment of the facilities by other residents of the Housing Project." (emphasis added).

Ledezma argues that there is legally and factually insufficient evidence to support the trial court's findings because HUD has defined a tenant's disruptive behavior as a minor rather than a serious violation; thus, a pattern of disruptive behavior must have persisted before eviction is warranted. We agree with Ledezma. "The operation of public housing by PHAs is subject to comprehensive federal regulation." *Sager v. Hous. Comn'n*, 855 F. Supp. 2d 524, 531 (D. Md.

2012). "Among other things, federal law dictates much of the content of public housing leases, requiring the inclusion of various provisions and prohibiting other provisions." *Id*. (citing 42 U.S.C. § 1437d(l); 24 C.F.R. part 966, subpart A). "In general, PHAs are prohibited from including 'unreasonable terms and conditions' in public housing leases." *Id*. (citing 42 U.S.C. § 1437d(l)(2)). According to federal law, leases in public housing are "automatically renewed" yearly, and they "cannot be terminated by a PHA except for '*serious or repeated violation of the terms or conditions of the lease or for other good cause*." *Id*. (quoting 42 U.S.C. § 1437(l)(5) and citing 24 C.F.R. § 966.4(a)(2), (l)(2)) (emphasis added).

In compliance with these federal requirements, Ledezma's lease with Laredo Housing Authority stated that her lease could be terminated "only *for serious or repeated violations* of material terms of the Lease" "or for other good cause:

> **XVII. Termination of the Lease:** In terminating the Lease, the following procedures shall be followed by the PHA and Tenant:
> (a) The Lease may be terminated prior to its expiration date *only for serious or repeated violations of material terms of the Lease*, such as failure to make payments due under the lease or to fulfill Tenant obligations set forth in Section IX above, *or for other good cause. Such serious or repeated violation of terms shall include but not be limited to*: . . .
> > (7)      *Criminal or other activity by Tenant*, household members, guests or other persons under Tenant's control. Includes criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants, or any drug-related criminal activity. In deciding to evict for criminal activity (including domestic violence, dating violence, or stalking), PHA shall have discretion to consider the circumstances of the case, including seriousness of the offense, the extent of participation by or awareness of family members, and the effect that the eviction would have both on family members not involved in the prescribed activity and on the family's neighbors. In appropriate cases, PHA may permit continued occupancy by remaining family members (including family members who are victims of domestic violence, dating violence or stalking) and may impose a condition that family members who engaged in the prescribed activity will neither reside nor visit the unit. PHA may require a family member who has engaged in the illegal use of drugs to present credible

> evidence of successful completion of a treatment program as a
> condition to being allowed to reside in the unit.

(emphasis added). Read in context, this paragraph makes clear that serious violations relate to criminal activity as most of the examples point to criminal and drug-related activities. Any other violation must be "repeated."

Ledezma emphasizes that the notices of lease termination provided to her cited only one specific incident on November 10, 2016. She argues that behavior by tenants limited to isolated instances are not sufficient to support eviction. She also argues that any conduct relating to her rights under the First Amendment cannot form the basis for her eviction. The parties agree that for purposes of analysis under the First Amendment, the tenants' council meetings and the community events sponsored by LHA occurred in a limited public forum. *See Crowder v. Hous. Auth.*, 990 F.2d 586, 590 (11th Cir. 1993) (holding auditorium was limited public forum because public housing authority opened it to a wide range of expressive activities, including ceramics classes, political speeches, and religious services). A limited public forum is a forum for certain groups of speakers or for the discussion of certain subjects. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 n.7 (1983); *see City of Madison Joint Sch. Dist. v. Wis. Pub. Emp't Relations Comm'n*, 429 U.S. 167, 175 (1976) (holding teachers have a right to speak on a contract at a school board meeting, which is a limited public forum for subjects relating to the operation of the district's public schools).

The undisputed evidence at the bench trial shows that at the tenants' council meeting in November 2016, the complained-of conduct by Ledezma, including her comments and her attempts to have other tenants sign a petition, related to Ledezma advocating the board for a change in policies at the housing complex. Thus, the undisputed evidence shows that Ledezma's conduct related to matters of public concern. Moreover, while there was evidence that Ledezma was

disrespectful in making her comments, there was no evidence that she used "true threats," words of "incitement," or "fighting words." *See Virginia v. Black*, 538 U.S. 343, 359 (2003) (explaining that the First Amendment does not protect "fighting words"—"those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction"—or "true threats"—"those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals"); *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (explaining "the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action"). That other tenants were angry at Ledezma's comments are not sufficient to justify a violation of her rights under the First Amendment. *See Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) (noting that free speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger"). Therefore, we conclude Ledezma's conduct is protected by the First Amendment.

LHA argues that a rule prohibiting "disruptive conduct," as found by the trial court, was a reasonable regulation at a tenants' council meeting and not in violation of the First Amendment. Under the First Amendment, the government can restrict speech in a limited public forum "as long as the restriction is (1) reasonable in light of the purpose served by the forum and (2) does not discriminate against speech on the basis of viewpoint." *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 426-27 (5th Cir. 2020). The undisputed evidence at trial showed that the board members in question were offended because of the substance of Ledezma's comments. The record is replete with references that the tenants in question were offended because Ledezma was

advocating for the elderly to be moved to a different housing project. Thus, as applied to the evidence in this case, upholding Ledezma's eviction based on her conduct at the tenants' council meeting would be an infringement of her rights under the First Amendment. Evidence of other conduct by Ledezma includes her being loud, boisterous, and rude in general. Although it appears from the testimony that the witnesses in question did not like Ledezma, their testimony does not rise to sufficient proof that Ledezma committed an "activity that threatens the health, safety, or right to other Tenant[s'] peaceful enjoyment of their accommodations or community facilities" in the context of the federal requirements for termination of a lease. We therefore hold the evidence is legally insufficient to support Ledezma's eviction.[2]

## CONCLUSION

Because the evidence is legally insufficient to support the trial court's findings, we reverse the judgment of the trial court. In accordance with Ledezma's request in her brief, we remand this cause to the trial court for proper disposition in accordance with this opinion.

Liza A. Rodriguez, Justice

---

[2]Having held the evidence is legally insufficient to support Ledezma's eviction, we need not consider Ledezma's issue that the evidence is factually insufficient.